533 So.2d 1078 (1987)
John B. NIXON, Sr.
v.
STATE of Mississippi.
No. DP-65.
Supreme Court of Mississippi.
November 25, 1987.
Rehearing Denied November 30, 1988.
*1082 Clive A. Stafford Smith, Atlanta, Ga., for appellant.
Edwin Lloyd Pittman, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., and Felicia C. Adams, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc:
*1083 PRATHER, Justice, for the Court:
John B. Nixon, Sr. was convicted in the Circuit Court of Rankin County of capital murder of Mrs. Virginia Tucker as the trigger man in a murder-for-hire scheme. Miss. Code Ann. § 97-3-19(2)(d) (1987) provides the definition of such a crime as:
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
(d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals;
From that conviction and a sentence of death, Nixon perfects this appeal, assigning 18 errors, which will be discussed in the order they arose at trial.

I.
Shortly before 8:00 a.m. on January 22, 1985, Thomas Tucker was walking through the den of his home in Rankin County, Mississippi, when his wife, Virginia Tucker, answered a knock at the back door. Mrs. Tucker ran backwards from the door through which entered an "old man," later identified as John Nixon, Sr., and two younger men, identified as Henry Leon Nixon and Gilbert Jimenez. Henry Leon Nixon is John Nixon, Sr.'s son.
After telling the Tuckers "I brought y'all something," John Nixon, Sr. pulled a .22 caliber pistol from his coat. Mr. Tucker immediately responded, "I know Joe Ponthieux hired you to kill us, but we got some money if that's what you (sic) after."[1] John Nixon, Sr. responded, "That's not what I'm after. The deal has already been made."
John Nixon, Sr. then pointed the pistol at Mr. Tucker and pulled the trigger, but the pistol misfired. Mr. Tucker seized the opportunity to dart toward the front door and pull it open, but he was hit in the left side and knocked to the ground by a second shot. Mr. Tucker managed to pull himself up and to continue his escape. John Nixon, Sr. passed the pistol to Henry Leon Nixon who chased Mr. Tucker into the yard and fired a third shot that grazed Mr. Tucker's head.
Mr. Tucker eventually made his way over 100 yards to the road and was picked up by a small truck and carried to his work site, the Mississippi Power & Light office in Brandon, Mississippi.
Meanwhile, inside the Tucker house, Gilbert Jimenez wrestled Mrs. Tucker to the floor where he kept her pinned during the shooting. When Henry Leon Nixon returned the pistol to John Nixon, Sr., Mr. Nixon, Sr. held the pistol one inch from Mrs. Tucker's head, behind an ear, and fired a shot into Mrs. Tucker's brain. The three intruders then drove away in a Ford van.
When Mr. Tucker arrived at the Mississippi Power & Light office, he was taken inside where he asked Mr. Carl Corley to go to the aid of Mrs. Tucker. Mr. Corley immediately drove to the Tucker home where he found Virginia Tucker lying on the floor, gasping for breath, with blood running from her mouth and nose. According to Mr. Corley, he arrived at the Tucker home within fifteen minutes of the time Mr. Tucker arrived at the MP & L office. Virginia Tucker was taken to a hospital where she died the next day.
The search for Virginia Tucker's killers was on-going for most of 1985. On November 4, 1985, John Nixon, Sr. was arrested after being identified in a personal lineup by Thomas Tucker. Shortly afterward, John Nixon, Jr. was arrested in Louisiana and Henry Leon Nixon was arrested in Los Angeles, California.
Also, the Ford van in which the killers made their getaway was eventually discovered in Houston, Texas. That discovery led to the arrest of Gilbert Jimenez on January 7, 1986 in Houston.
While in the custody of the Houston, Texas police, Jimenez executed a written statement implicating the three Nixons in the murder-for-hire scheme. Subsequently, Joe Ponthieux, former husband of Virginia *1084 Tucker, was arrested and indicted along with the three Nixons for capital murder in violation of Miss. Code Ann. § 97-3-19(2)(d), as amended.
John Nixon, Sr.'s case was severed and was tried in a three day trial beginning March 24, 1986. Gilbert Jimenez, who plea-bargained to the charge of conspiracy to commit capital murder, testified at John Nixon, Sr.'s trial, describing the details of the pre-murder preparations and the payments to John Nixon, Sr. and John Nixon, Jr. by Joe Ponthieux.
The jury deliberated only thirty-one minutes before returning a verdict of guilty of capital murder. The penalty phase of the trial was then conducted after which the jury deliberated sixty-seven minutes before returning their decision in an improper form.
The jury was sent back to the jury room with a correcting instruction. Twenty-five minutes later, the jury returned a death penalty verdict, having found: (1) the capital offense was committed for pecuniary gain; (2) the capital offense was especially heinous, atrocious, and cruel; and (3) the defendant had previously been convicted of a felony involving the use and threat of violence to a person.
After John Nixon, Sr.'s motion for new trial was overruled, he perfected this appeal.

II.

Was the impartiality of the venire questioned because of the number of venire members with ties to law enforcement?
Our criminal justice system is geared toward providing a defendant a fair trial. Among the constitutional guarantees aimed at securing a fair trial is the requirement of Article 3, Section 26, Mississippi Constitution, that a defendant is entitled to a "trial by an impartial jury." Thus the challenge of this assignment of error is whether an impartial jury was provided whose attitudes were uninfluenced with a number of law enforcement connections of the venire members.
When questioned whether they had ties to law enforcement, sixteen members of the remaining sixty member venire responded affirmatively. Of those sixteen, four were struck for cause. Of the remaining twelve, three found their way onto the jury and one became an alternate juror.
The ties the jurors had with law enforcement varied. Juror Hemphill was part owner of an air-conditioner company that worked on highway patrol cars. Juror Jones had a nephew who was a law enforcement officer in Franklin County. Juror Hester was friends with a constable. The alternate, Juror Eaton, had a deceased cousin who was once sheriff of Chickasaw County.
Based on those ties, Nixon contends the jury that tried him "was so improbably replete with associates of law enforcement as to `adulterate its neutral and impartial decision.'"
As authority, Nixon cites Mhoon v. State, 464 So.2d 77 (Miss. 1985), which is factually distinguishable from the instant case. In Mhoon, twelve of thirty-nine potential jurors were either police officers or related by blood or marriage to current or former police officers. Id. at 80. Six of the twelve jurors were chosen for the jury with a uniformed police officer acting as foreman. After exhausting all his peremptory challenges, Mhoon requested the trial judge excuse the law enforcement-related jurors for cause, but that request was rejected. Id.
Referring to the makeup of the Mhoon venire as a "statistical aberration," this Court reversed and remanded for a new sentencing hearing. Id. at 85. Commenting on its line of reasoning, the Court held, "[T]he sheer number of law enforcement-connected persons in the jury pool, as well as persons selected as jurors, has worked a great hardship on Mhoon." Id. at 81.
In the instant case, there is simply no showing of hardship suffered by Nixon. There are only bare assertions. None of the three law enforcement-related jurors had a particularly close tie to law enforcement and none of the three served as jury *1085 foreman. In addition, Nixon used only ten of his twelve peremptory challenges and was informed by the trial judge that more peremptory challenges would be considered if needed.
For those reasons, this Court holds this assignment of error is without merit.

III.

Did the trial court err in excusing for cause venireperson Dorothy Jenkins?
After informing the prospective jurors that the chosen jury would have to be sequestered, the trial judge asked the venire whether sequestration would present a hardship and a burden to each venireperson. Of the jurors who responded affirmatively, Mrs. Dorothy Jenkins stated she had four children at home and her husband was out of town. Mrs. Jenkins' children were ages 13, 15, 17, and 19.
The trial judge excused Mrs. Jenkins because "she had children at home with no one to care for them and could not suffer sequestration without an undue hardship." When asked whether they objected to the excusal of several potential jurors, including Mrs. Jenkins, one of the defense attorneys responded, "We would so state into the record that we feel the court justifiably for cause allowed to be peremptorily excused for cause all the jurors that were excused... ."
On appeal, Nixon argues the trial court erred in excusing Mrs. Jenkins. As a general rule "the court, in the exercise of sound discretion, may excuse a juror before he is sworn for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient." 47 Am.Jur. Jury § 121 (1969). See also, Brown v. State, 38 So. 316 (Miss. 1905) (Venireperson excused because he desired to be at home when his son left for the Philippine Islands.)
The trial judge was well within his discretion to excuse Mrs. Jenkins. This assignment of error has no merit.
Also, Nixon contends the prosecutor made an improper comment on voir dire concerning Nixon's failure to testify in his own behalf.
During voir dire, the defense attorney, not the prosecutor, engaged the venire in a series of questions regarding Nixon's right to remain silent. During this exchange, the district attorney asked to approach the bench, after which the defense attorney was asked to rephrase one of his questions. Thereafter, the following occurred:
BY DEFENSE COUNSEL: Do you all understand that the fact that John B. Nixon does not testify is not an indication of his guilt if he does not testify? Do you all understand this?
BY THE COURT: The proper question, Mr. Townsend, is not evidence of his guilt.
BY DEFENSE COUNSEL: It is not evidence of his guilt. Do you all understand this?
This Court, gleaning no improper conduct by the prosecutor or the trial judge, holds this contention is without merit.

IV.

Did the trial judge's statements trivialize the role of the jury in a manner incompatible with the seriousness of a capital trial?
Once the jury was chosen, but before they were sworn, the trial judge reiterated the importance of the jury's sequestration. During this soliloquy by the trial judge, he shared a humorous anecdote which had arisen in another trial. On appeal, Nixon's cites the trial judge's action as error.
While there is no doubt that there can be no graver proceeding than when a human being is put on trial for his life, see Fuselier v. State, 468 So.2d 45, 53 (Miss. 1985), the judge's minor attempt at levity in the preliminary stages of the trial seems much more geared toward easing the jurors' tensions over sequestration than detracting from the solemnity of the occasion. There is no merit to this assignment of error. See Buckelew v. United States, 575 F.2d *1086 515, 519 (5th Cir.1978) (Telling of jokes by trial judge did not render trial fundamentally unfair where introduction of evidence was not thwarted.)

V.

Is Nixon entitled to relief under Batson v. Kentucky?

Although Nixon made no objection to the racial makeup of the jury, on appeal he contends he was denied the right to equal protection of the law because "the prosecutor set out to achieve an all-white jury through abuse of his [peremptory] challenges." (Emphasis added) It should be noted at the outset that Nixon is a white male, 59 years old, and that the jury was composed of twelve whites, and the victim was a white female.
The State initially argues Nixon's Batson argument is procedurally barred because there was no objection at trial. See Williams v. State, 507 So.2d 50 (Miss. 1987); Jones v. State, 517 So.2d 1295 (Miss. 1987) (on petition for rehearing); Irving v. State, 498 So.2d 305, 318 (Miss. 1986).
The State's next argument is that Nixon's claim fails on the merits. This Court agrees.
Nixon relies on the now-familiar decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In Batson, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 83.
To establish a prima facie case under Batson, a petitioner must establish:
(1) that he is a member of a "cognizable racial group,"
(2) that the prosecutor has exercised peremptory challenges toward the elimination of veniremen of the defendant's race and
(3) that attendant facts and circumstances infer that these challenges were made for the purpose of striking minorities from the jury.
476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87.
Given the fact that Nixon is white and the jury was made up of three white men and nine white women, this Court holds that Nixon has not and could not present a prima facie case for relief under Batson. Therefore, this assignment of error is without merit.

VI.

Should the in-court identification of Nixon by Thomas Tucker have been suppressed?
Before being arrested and indicted for the January 22, 1985 murder, Nixon was positively identified as one of the assailants by Thomas Tucker at an October, 1985 lineup conducted in Jackson, Mississippi. Thomas Tucker had previously identified in a March, 1985 lineup a Henry Cooper who Tucker said "looked very much like" John Nixon.
Prior to trial, Nixon filed a "Motion to Suppress Pre-Trial Lineup Identification," alleging that the pre-trial lineup was unduly suggestive and was conducted while Nixon was unrepresented by counsel. Thereafter, prior to voir dire, defense counsel moved to withdraw the said motion. At trial, during the direct examination of Thomas Tucker, Tucker identified John Nixon, Sr. as the man who entered his house and shot him. There were no objections made during the identification testimony.
On appeal, Nixon contends the in-court identification should have been suppressed because the out-of-court identification was unduly suggestive and was made while Nixon was deprived of his right to counsel.
There was no objection made at trial to any identification testimony. In fact, the defendant's motion to suppress had been withdrawn.
Generally, where there was no motion or contemporaneous objection at trial, this Court will not consider an error raised for *1087 the first time on appeal. Miss.R.Evid. 103(a)(1); Copeland v. State, 423 So.2d 1333, 1335 (Miss. 1982). However, this Court has recognized exceptions to the general rule when errors affect fundamental rights. Gallion v. State, 469 So.2d 1247, 1249 (Miss. 1985) (denial of due process). In addition, this Court may notice "plain error" affecting substantial rights. Miss. Sup.Ct.R. 6(b); Miss.R.Evid. 103(d).

A.

Unduly Suggestive Lineup?
An impermissibly suggestive pre-trial identification does not preclude an incourt identification by an eyewitness who viewed the suspect unless from the totality of the circumstances the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. York v. State, 413 So.2d 1372, 1383 (Miss. 1982); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).
The current guidelines for judging the admissibility of identification testimony are found in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In Manson, the United States Supreme Court concluded:
[R]eliability is the linchpin in determining the admissibility of identification testimony for [alleged improperly suggestive] confrontations. The factors to be considered ... include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
Manson, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. See also Jones v. State, 504 So.2d 1196 (Miss. 1987); Ray v. State, 503 So.2d 222 (Miss. 1986); Thompson v. State, 483 So.2d 690 (Miss. 1986).
In Manson, the United States Supreme Court reaffirmed the pattern of analysis emanating from Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
Under the totality of the circumstances of this record as contemplated by Manson and Neil, the trial judge committed no error in allowing Thomas Tucker's in-court identification.

B.

Right to Counsel?
The right to counsel under the United States Constitution attaches at the commencement of formal criminal proceedings of an adversarial nature. Kirby v. Illinois, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417 (1972). The United States Supreme Court emphasized in Kirby that the key dividing line is the initiation of adversary criminal proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417. See also Cannaday v. State, 455 So.2d 713, 722 (Miss. 1984). Formal charge and preliminary hearing are ordinarily pre-indictment proceedings under Mississippi practice.
Applying Kirby v. Illinois, this Court has held that the right to counsel does not extend to pre-indictment lineups. See e.g., Lannom v. State, 464 So.2d 492, 495 (Miss. 1985); Wilson v. State, 451 So.2d 718, 722 (Miss. 1984); Bankston v. State, 391 So.2d 1005, 1007 (Miss. 1980) and cases cited therein.
However, in Page v. State, 495 So.2d 436 (Miss. 1986) this Court, applying Miss. Const. Art. 3, § 26, held the accusatory stage began at the issuance of a warrant or "by binding over or recognizing the offender to compel his appearance to answer the offense." Id. at 439. See Miss. Code Ann. § 99-1-7 (1972); Cannaday v. State, 455 So.2d at 722. Stated practically, the adversarial process begins when the law enforcement arm of the state takes the defendant into custody, and charges him with a crime. Tolbert v. State, 511 So.2d 1368, 1375 n. 5 *1088 (Miss. 1987). See also Miss.Unif.Crim.R. Cir.Ct.Prac. 1.02 and 1.04.
In the instant case, the record merely reflects Nixon was arrested as a result of being identified in the lineup. It does not reflect that Nixon was or reasonably ought to have been charged with a crime prior to that time, nor does the record reflect that Nixon was without counsel at that time. For those reasons, this Court holds that Nixon's right to counsel had not attached at the time of the lineup.

VII.

Did the State commit a reversible Rule 4.06 discovery violation?
Nixon contends that certain oral statements allegedly made by him to Thomas Tucker, husband of the victim, and to Gilbert Jimenez, co-defendant, were discoverable and that his conviction should be reversed because the State failed to provide the statements during discovery. Tucker's oral statement was that "the deal has already been made." The statement elevates Nixon's crime to capital murder, rather than murder, as it provides some proof that the defendant "has been offered or has received something of value for committing the murder" of Virginia Tucker. Therefore, this assignment of error is significant.

A.

Statement by Nixon to Tucker
Two months prior to trial, the trial judge issued an order granting discovery pursuant to Rule 4.06 of the Mississippi Criminal Rules of Circuit Court Practice. Thereafter, the prosecutor turned over two transcribed statements of Thomas Tucker and made available the original tape recordings of Tucker's statements. Both statements were made while Tucker was a patient at Rankin County General Hospital. The prosecutor also responded that Nixon had made no statements the State knew of or intended to use at trial.
At trial, Thomas Tucker was asked on direct examination to describe the events leading to his wife's shooting. Referring to John Nixon, Sr., Mr. Tucker testified:
A. He reached in his coat and pulled out a pistol; and when he did, I told him, "I know Joe Ponthieux hired you to kill us, but we got some money if that's what you (sic) after." He said, "That's not what I'm after. The deal has already been made."
(Emphasis added). No objection was made to this testimony.
On cross-examination, Tucker was repeatedly asked if and when he had told investigators of Nixon's statement "The deal has already been made." Tucker testified he had revealed Nixon's statement, but he could not remember when and to whom.
Later in the trial, Investigator John Edwards of the Mississippi Highway Patrol testified on cross-examination that during his numerous interviews of Tucker, Mr. Tucker had never told him of Nixon's statement that "The deal has already been made." Investigator Edwards was aware, however, that Tucker had told other people of Nixon's remarks.
Also during the cross-examination of Edwards, District Attorney Orbie Craft informed the court that Mr. Tucker had told him of Nixon's statement. District Attorney Craft explained, however, that it was his understanding that his "obligation was to give them any memorandum of witnesses' statements, whether it be a written statement or an oral statement that was reduced to memorandum and not just our pre-trial interviews with witnesses ..." and that he thought the verbal statement was not discoverable under the court's order.
After several other witnesses testified, Nixon moved for a continuance based on the prosecutor's failure to reveal the alleged statement made by Nixon to Tucker. Nixon contended that had he known of the alleged statement prior to trial, he would have been better prepared to cross-examine Thomas Tucker concerning the alleged statement. Nixon requested the continuance so he could interview all the investigators who had interviewed Tucker.
*1089 The Court granted Nixon's continuance and recessed early[2] with instructions to the district attorney to help locate all the investigators who had interviewed Tucker.
The court was to reconvene the next day at 9:00 a.m., but Nixon was told that if he could not be ready, the court would stand by until he was ready. Nixon was also informed he would be allowed to recall any of the witnesses for further cross-examination.
The next morning the defense attorney informed the court that he had interviewed all the relevant investigators but that he did not wish to recall Thomas Tucker for further cross-examination. Instead, Nixon moved for a mistrial stating that it would be more damaging to recall Tucker than not to recall him.
The trial judge failed to see what damage Nixon would suffer by recalling Tucker that Nixon would not have suffered on the initial cross-examination had he known of the statement beforehand. The trial judge even offered to limit the scope of examination on Tucker's recall so the prosecutor could not introduce new matters. Still, Nixon elected not to recall Tucker. The trial judge then overruled Nixon's motion for mistrial.
The analysis of this assignment of error must begin by determining whether the oral statement made by Nixon to Tucker, and later relayed by Tucker to Craft, was discoverable under Rule 4.06, Uniform Rules of Criminal Court Practice. Rule 4.06 states in pertinent part:
The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph upon request and without further order the following:
(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial;
(2) Copy of any recorded statement of the defendants to any law enforcement officer;

.....
Upon a showing of materiality to the preparation of the defense, the court may require such other discovery to defense counsel as justice may require.
.....
If, subsequent to compliance with these rules or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.
.....
If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.
(Emphasis added)
Oral statements made by defendants to law enforcement officers are discoverable under Rule 4.06. Moore v. State, 508 So.2d 666, 668 (Miss. 1987); Boches v. State, 506 So.2d 254, 262 (Miss. 1987); Franklin v. State, 460 So.2d 104, 106 (Miss. 1984).
The fact that the statement was made, not to a law enforcement officer, but to a victim during the course of the crime is of no moment. The victim relayed the statement to the district attorney. Others told law enforcement officers of it. The prosecution team had knowledge of Tucker's statement before trial. Mississippi Highway Patrol Investigator Edwards was aware Tucker had told other people of Nixon's remarks. While Edwards was on cross-examination, the district attorney stated he was aware of the statement. The prosecution had an obligation to disclose what any member of its team knew. *1090 Smith v. State, 500 So.2d 973, 980 (Miss. 1986); White v. State, 498 So.2d 368, 370 (Miss. 1986); Fuselier v. State, 468 So.2d 45, 56 (Miss. 1985).
There is an independent reason why the prosecution was obligated to produce the statement. On March 13, 1986, the district attorney told the defense in writing that Nixon had made no statements, but that if such statements did come to the attention of his office, such statements would be furnished to the defendant.
The statement was discoverable. Our question becomes, what consequences flow from the fact that it was not disclosed to the defendant until the middle of the trial. We decide such questions according to the so-called Box guidelines[3] adopted and followed in a number of recent cases. See Cole v. State, 525 So.2d 365 (Miss. 1987); Griffin v. State, 504 So.2d 186 (Miss. 1987); Watts v. State, 492 So.2d 1281, 1290 (Miss. 1986); Gray and Nations v. State, 487 So.2d 1304, 1313-14 (Miss. 1986); Henry v. State, 484 So.2d 1012, 1014 (Miss. 1986); and Jones v. State, 481 So.2d 798, 803 (Miss. 1985). The Box guidelines are:
First
In cases where the state seeks to offer into evidence that which it ought to have disclosed pursuant to a discovery request but didn't, it is first incumbent upon the defendant to make timely objection. If this be done, the court's initial response should be a directive that the defense be given a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs, etc. The court should not be grudging in this allowance.
Second
If, after examining the evidence involved or interviewing the would-be witness, the defendant is of the opinion that he has been subjected to unfair surprise and that his defense will be prejudiced if the evidence is offered without his having had the opportunity to investigate independently the credibility of the evidence and possible responses thereto, it should then be incumbent upon him to request expressly that the court grant a continuance. In most instances this will necessitate a declaration of a mistrial. In any event, and in such a situation and absent unusual circumstances to the contrary, the trial court ought conditionally grant the requested continuance, at which time the matter is checked back to the state.
Third
If the state is of the opinion that for whatever reason it wants to use the witness or the evidence in its case against the defendant, the order for a continuance must stand. At this point, however, the state should have the election. If the state withdraws its offer of the evidence in dispute and agrees to proceed wholly without use of this evidence, the order for continuance should be withdrawn and the trial should proceed as in the ordinary course.
Box, 437 So.2d at 23-24.
Defendant Nixon's principal failure under these guidelines is that he failed to make a timely objection when the statement was offered. Despite that failure, the trial judge later, once the point was brought to his attention, complied fully with the spirit of the guidelines, and allowed the defendant time to interview the investigating officers to obtain whatever information the defense needed. The trial judge also offered to allow Nixon to recall any witness for further cross-examination. Nixon declined to recall Tucker judging the recall would do more harm than good. After an overnight recess, defense counsel merely moved for a mistrial.
When certain circumstances arise as enumerated in the guidelines, the defense is automatically entitled to a mistrial or continuance. To obtain access to that entitlement, the defendant under the first guideline had to make a timely objection. Defendant did not do this. In fact, he made *1091 no objection until several witnesses later. In any event, the trial judge ordered a break in the action. Nixon was given an overnight recess. The judge told the defense counsel that, if he could not be ready at 9:00 a.m. the next morning, the court would stand by until the defense was ready. The guidelines contemplate this sort of "continuance". See Foster v. State, 484 So.2d 1009, 1011 (Miss. 1986) ("in some cases even an hour or two will suffice"). A combined consideration of these two points  Nixon's failure to object in a timely manner and, notwithstanding, the generous "continuance" he was granted  weakens the force from this assignment of error. Moreover, this case may not be distinguished from other capital cases in which we have enforced the Box guidelines against defendants. See Cole v. State, supra; Cabello v. State, 471 So.2d 332, 343 (Miss. 1985).
The assignment of error is denied.

B.

Statements by Nixon to Jimenez
While in the custody of the Houston, Texas police, Gilbert Jimenez executed a written statement describing the events surrounding the murder of Virginia Tucker. In that statement given to a law enforcement officer, Jimenez said that John Nixon, Sr. told him a man had hired him to murder the man's former wife. The contractor was identified by Jimenez at trial as Joe Ponthieux. This written statement was given the defense under the discovery order. The content of the "murder-for-hire" scheme was made known through the written statement given to law enforcement, and no withholding of information to the defendant of that fact is shown. The requirement that disclosure of every spoken word to the officer is not intended so long as the state fairly gives notice to the defendant of the content of the defendant's statement.
Jimenez's testimony at trial is replete with statements made to him by Nixon concerning the planning of the murder. Nixon contended at trial, and now on appeal, that the prosecutor was required to disclose every statement made by Nixon to Jimenez. This Court disagrees.
It is undisputed that Nixon received a copy of Jimenez's written statement to the Houston, Texas police. That statement gave Nixon more than ample notice that Jimenez would testify concerning Nixon's employment to murder Virginia Tucker.
For that reason, this Court agrees with the trial judge who said, "I don't think that the district attorney could possibly anticipate exactly everything [Jimenez] would say on the witness stand. I think that it is just a completely unreasonable burden to put on the prosecution." This Court only qualifies that statement by adding that the discovery must give fair notice to the defendant. The trial court is affirmed.

VIII.

Did the trial court err in admitting hearsay statements of co-conspirators as exceptions to the hearsay rule?
During the direct examination of Gilbert Jimenez, Jimenez repeated numerous statements made by John Nixon, Sr., John Nixon, Jr., and Henry Leon Nixon. The statements were made by the various co-defendants during the preparation for, the commission of, or the aftermath of the killing of Virginia Tucker. Few of the repeated statements elicited contemporaneous objections from the defense counsel.
On appeal, Nixon contends the introduction of the statements deprived him of his right to confrontation and to a fundamentally fair trial as guaranteed under Mississippi Constitution, Article 3, Section 26, which provides: "In all criminal prosecutions the accused shall have a right ... to be confronted by the witnesses against him... ." Also, U.S. Const.Amend. VI.
Based on a review of the record and of applicable caselaw, this Court disagrees.
Once a conspiracy is established the statements of co-conspirators are admissible if made in the course of and in furtherance of the conspiracy. Miss.R. Evid. 801(d)(2)(E); Mitchell v. State, 495 *1092 So.2d 5, 11 (Miss. 1986); Browning v. State, 30 Miss. 656, 671-672 (1856).
It should be remembered, however, that statements made after the objectives of the conspiracy have either succeeded or failed are inadmissible. Krulewitch v. U.S., 336 U.S. 440, 442, 69 S.Ct. 716, 718, 93 L.Ed. 790, 794 (1949). See also, Comments to M.R.E. 801(d)(2)(E).
The issues under this assignment of error are narrowed to two questions: (1) Was a conspiracy established prior to the testimony of Jimenez? and (2) Were the statements of the co-conspirators made in the course of and in furtherance of the conspiracy?

A.

Conspiracy
This Court recently reiterated in Peoples v. State, 501 So.2d 424 (Miss. 1987), the essential elements needed to form a conspiracy. "Conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy." Id. at 428 quoting Griffin v. State, 480 So.2d 1124, 1126 (Miss. 1985).
For there to be a conspiracy, "[t]here must be recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose." Peoples v. State, 501 So.2d at 428; McDonald v. State, 454 So.2d 488, 495 (Miss. 1984). The conspiracy agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators. Gray v. State, 487 So.2d 1304, 1306 (Miss. 1986). Furthermore, the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence. Mere association, however, is not enough. Davis v. State, 485 So.2d 1055, 1058 (Miss. 1986).
Prior to Jimenez's testimony, it was established that a room was rented to John Nixon, Sr. at a Jackson motel. On the morning Mrs. Tucker was shot, John Nixon, Sr., Henry Leon Nixon, and Gilbert Jimenez entered the Tucker home uninvited after which John Nixon, Sr. pulled a .22 caliber pistol and told the Tuckers that the deal had already been made. The prior testimony further proved that Mr. Tucker was shot, but he attempted a successful escape during which he noticed a van in the driveway. The van was identified by other witnesses who saw it before the shooting and after the shooting. Other evidence proved Mrs. Tucker died from a.22 caliber gunshot to the head.
Based on the above-mentioned evidence, this Court holds evidence supporting a conspiracy was sufficiently proved prior to Jimenez's testimony. This Court rejects the notion of the defendant that the trial court has to specifically make such a finding in the record. On the contrary, the trial court's ruling on the admissibility of the hearsay testimony constitutes such a conclusion if supported by the record.

B.

"In the course of and in furtherance of the conspiracy?"
For the sake of brevity this Court will not repeat every single co-conspirator statement to which Jimenez testified during his direct examination. Suffice it to say the statements allowed into evidence were made in the course of and in furtherance of the conspiracy.
This Court notes specifically that several of the statements were made after the shooting occurred. For example, John Nixon, Jr. was quoted as saying, "I got the rest of the money." This Court holds that this statement and others similar to it were admissible because the murder-for-hire conspiracy did not end until at the earliest, the conspirators had knowledge that payment had been made. See United States v. Xheka, 704 F.2d 974, 986 (7th Cir.1983); United States v. Fischetti, 450 F.2d 34, 41 (5th Cir.1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478 (1972).
For all the reasons set out above, this Court holds the trial judge committed no *1093 error in allowing Jimenez to repeat statements made by co-conspirators. Therefore, the trial court is affirmed on this point.

IX.

Was there prosecutorial misconduct during the guilt phase depriving Nixon of his Fifth, Sixth, Eighth or Fourteenth Amendment Rights?
Under this assignment of error, Nixon imputes misconduct to the prosecutors for five alleged constitutional violations occurring at different times during the guilt phase of his trial.

A.

Testimony of Gilbert Jimenez
Nixon maintains Jimenez was improperly allowed to testify to facts learned subsequent to Jimenez's arrest. Those facts included:
(1) the name of the bar where Nixon obtained the gun used in the slaying of Mrs. Tucker;
(2) the type truck that Mr. Tucker left in after he escaped from Nixon and his confederates on the day of the shooting;
(3) the fact that a bullet struck Mr. Tucker behind the ear rather than in the back as Jimenez had previously thought;
(4) the name of Joe Ponthieux even though the witness did not initially know his name when they began to plan Mrs. Tucker's murder;
(5) the fact that Mr. Nixon came out with money from Joe Ponthieux's house.
Initially this Court notes that defense counsel made no objections to the testimony referenced (1), (3), (4), and (5). To the contrary, counsel did object to the statement referenced as (2), and the objection was sustained. The State argues that without objection these points were not preserved for appeal. Miss.R.Evid. 103(a)(1); See Temple v. State, 498 So.2d 379, 381 (Miss. 1986); Baker v. State, 327 So.2d 288, 292 (Miss. 1976) (Contemporaneous objection is necessary to preserve the right to raise an error on appeal).
This Court holds that these facts elicited were tangential at best and constituted no more than harmless error. See Miss.Sup. Ct.R. 11.
Nixon also cites as error Jimenez's description of a conversation he had with his girlfriend. Nixon argues this testimony was a comment on parole and was a fundamental denial of his rights.
These statements, to which no objection was made, can hardly be said to be such a comment on parole as to cause reversible error. Cf. Williams v. State, 445 So.2d 798, 813 (Miss. 1984).
Finally, Nixon argues the testimony of Jimenez was flawed because of alleged inconsistencies with prior statements and with testimony of other witnesses. The well-recognized rule that the jury is the sole judge of the credibility of a witness as well as the weight and worth to be afforded his testimony. Kinzey v. State, 498 So.2d 814, 818 (Miss. 1986); Griffin v. State, 495 So.2d 1352, 1354 (Miss. 1986); Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980).

B.

Buckley Violation?
During the direct examination of co-indictee Gilbert Jimenez, the State had marked for identification the plea bargain agreement executed by Jimenez. That agreement stated that Jimenez would plead guilty to a charge of conspiracy to commit capital murder.
Also during the direct examination of Jimenez, the following exchange occurred:
Q. What, if any, crimes have you ever been convicted of?
A. I had a burglary charge back in '79, but Houston Police Department couldn't find my 
BY DEFENSE COUNSEL: I object to what they couldn't find. That is hearsay.
BY THE COURT: Sustained.
Q. But, anyway, you are telling us that you were convicted of that?
A. Yes, sir.

*1094 Q. And this here?
A. Yes, sir.
During cross-examination of Jimenez, defense counsel questioned him extensively concerning his guilty plea to conspiracy to commit capital murder, his twenty year sentence, and prior inconsistent statements made during his arraignment hearing.
The defense attorney also mentioned in his closing argument Jimenez's guilty plea and the prior inconsistent statements Jimenez made during the hearing in which he entered his plea.
On appeal, Nixon contends the State committed reversible error by using Jimenez's guilty plea against Nixon. Nixon cites as authority Buckley v. State, 223 So.2d 524 (Miss. 1969) which held:
[W]here two or more persons are jointly indicted for the same offense but are separately tried, a judgment of conviction against one of them is not competent evidence on the trial of the other because such plea of guilty or conviction is no evidence of the guilt of the party being tried.
Id. at 528. See also Henderson v. State, 403 So.2d 139, 141 (Miss. 1981) and Warren v. State, 407 So.2d 100, 101 (Miss. 1981), both reaffirming Buckley.
This Court notes that the defense counsel in the instant case neither objected to the testimony at trial, nor specifically assigned it as error in his motion for new trial.
More recently, the Buckley rationale was explained and distinguished on its facts in Johnson v. State, 477 So.2d 196 (Miss. 1985), in which the prosecutor brought out that a co-indictee had pled guilty to the crime for which Johnson was tried. Id. at 213.
In limiting Buckley to its own facts, this Court held:
We do not overrule Buckley, but neither do we extend its holding beyond the unusual situation of that case. If defense counsel under some unusual case wishes to withhold from the jury the fact that a co-indictee testifying for the state has pleaded guilty and received a lesser sentence, he has a duty to object to the testimony offered by the state.
.....
To permit this defendant to say nothing at trial, and complain for the first time in post-trial proceedings presents a classic case of having your cake and eating it, too.
Id. at 214.
A thorough reading of the Buckley facts suggests the facts of the instant case are a clearer reflection of those in Johnson. For that reason, the Court holds there was no reversible error committed on this point.

C.

House Violation?
During its case-in-chief, the State produced four witnesses who positively identified photographs of the van that was recovered in Houston, Texas. All four witnesses identified the van as the one they saw at or near the Tucker home on the morning of the shooting. In addition, two of the witnesses identified a photograph of Henry Nixon as an occupant of the van.
One of the witnesses to identify both Henry Nixon and the van was Mrs. Alicia Arender. Basically, Mrs. Arender testified the identified van pulled out in front of her as she approached the Tuckers' driveway on the morning of January 22, 1985. Mrs. Arender followed the van for some distance and was able to see the reflection of the driver, Henry Nixon, in the rear-view mirror on the driver's side of the van.
Prior to her testifying at trial, at the request of a Rankin County Deputy Sheriff, Mrs. Arender underwent a "state of relaxation" in order to recall the tag number of the van she had seen. Mrs. Arender testified the video-taped session with a Dr. Stanley lasted an hour, but that she was unable to recall the tag number.
Mrs. Arender also testified, over the objection of defense counsel, that the identification she made of Henry Nixon was her own and was not a product of hypnotic suggestion. Mrs. Arender testified she was at all times aware of the questions *1095 asked and the answers given. On appeal, Nixon contends Mrs. Arender's testimony violated this Court's guidelines in House v. State, 445 So.2d 815 (Miss. 1984).
In House, the Court suggested guidelines for trial judges to follow before allowing a witness to testify from a hypnotically refreshed memory. See House, 445 So.2d at 826.
The facts of the instant case are simply distinguishable from those in House. Mrs. Arender was not testifying from a hypnotically refreshed memory. In fact, she admitted the "hypnosis" failed its essential purpose  to produce the tag number of the van. No reversible error is found here, particularly since three other witnesses identified the van.

D.

Improper prosecutorial arguments during the guilt phase?
During the final argument of the State, the district attorney argued that the jury should convict Nixon of capital murder and not manslaughter as defense counsel had suggested. In that context, the district attorney reviewed the evidence of payment to Nixon and concluded by saying, "This man is a hired killer."
Nixon cites the district attorney's description as error, contending it implied Nixon had been hired to kill someone before.
Most of the five volume record and three-day trial was dedicated to proving that Nixon committed a murder-for-hire. Calling Nixon a "hired killer" constituted no error, especially in light of the context of the district attorney's attempt to distinguish capital murder from manslaughter. Therefore, this Court holds this contention merits no further analysis.

X.

Did the trial court err by allowing jurors to take notes?
During the course of Nixon's trial, the jurors were permitted to take notes. During the discussion of the jury instructions between the trial judge and the attorneys, the trial judge and the defense attorneys agreed that a jury instruction should be granted to guide the jurors with regard to their written notes.
The court later gave instruction C-7 which informed the jurors that the notes were to be used only by the juror who took them as an aid to his or her own memory.
Although there is a recognized split of authority among jurisdictions concerning the propriety of juror notetaking, most authorities hold that making and using trial notes by jurors is not misconduct and may even be desirable where unattended by undue consumption of time. See Annot., 14 A.L.R.3d 831 (1967 & Cum.Supp. 1986). Even some jurisdictions not allowing juror note-taking have found no reversible error absent a showing of prejudice to the defendant. See, e.g., Commonwealth v. Maute, 485 A.2d 1138 (Pa. Super. Ct. 1984).
This Court concludes that there was no objection at trial to the juror notetaking, there were sufficient instructions by the court, and there was no prejudice shown to this defendant. Therefore, this assignment is without merit.

XI.

Was the jury improperly instructed during the guilt phase?
Nixon contends he was denied a litany of constitutional rights by jury instruction 3. Part 3 of jury instruction 3 instructed the jury that Nixon should be found guilty of capital murder if he "had been offered or had received money for committing such murder, if any; ..." That language tracks Miss. Code Ann. § 97-3-19(2)(d) (Supp. 1986).
This assignment of error is without merit.
Having found no reversible error in the guilt phase of this trial, this Court affirms the jury's finding of guilty.

XII.

Did the denial of Nixon's request for a private psychologist render the penalty phase fundamentally unfair?
Nixon did not raise the insanity defense at trial, nor did he claim to be *1096 incompetent to stand trial. Nixon's contention at trial and on appeal is that the trial court was constitutionally obligated to assist him, at the cost of $3,000 to Rankin County, in employing a psychologist to assist defense counsel in searching for and developing mitigating evidence during the sentencing phase of Nixon's trial.
By employing a private psychologist, Nixon was hopeful of establishing mitigating evidence under Miss. Code Ann. § 99-19-101(6)(b) ("The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.") or (f) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.")
Nixon's original "Motion for Psychological Assistance" was argued before Judge Goza who, upon examining the cost of such assistance, inquired if the defendant could have his psychological examination at the Mississippi State Hospital at Whitfield.
Nixon's counsel opposed Judge Goza's suggestions because it was their belief the State Hospital at Whitfield did not perform the evaluations for which Nixon was asking. Nixon's motion was denied.
Defense counsel's beliefs were later confirmed in an affidavit from Dr. Marsie Lancaster, an employee of the State Hospital. The affidavit read in part:
The Mississippi State Hospital at Whitfield is unable to conduct the requested evaluation as to any psychological mitigating circumstances of John B. Nixon Sr. for the purposes of assisting the defense.
The Mississippi State Hospital commonly conducts evaluations for purposes of determining the competency of persons to stand trial and sanity of the persons at the time of the commission of the crime, with same being the limits of our diagnostic responsibilities.
Prior to the commencement of the penalty phase, defense counsel renewed its "Motion for Psychological Assistance," which was again overruled.
Nixon relied at trial and relies on appeal on Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
After Ake's conviction and sentence were affirmed by an Oklahoma appellate court, the United States Supreme Court granted certiorari to consider the issue whether the United States Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question. 470 U.S. at 70, 105 S.Ct. at 1090, 84 L.Ed.2d at 58.
The U.S. Supreme Court reversed and remanded, holding:
We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.
470 U.S. at 83, 105 S.Ct. at 1097, 84 L.Ed.2d at 66.
There are several important factors distinguishing Ake from the instant case. Unlike Ake, Nixon did not attempt to use the insanity defense. Had he done so, the county would have been obligated to pay the cost of an examining psychiatrist of the court's choosing. Miss. Code Ann. § 99-13-11 (1972). See also Miss.Unif. Crim.R.Cir.Ct.Prac. 4.08.
Second, the State did not produce psychiatric testimony against Nixon in the penalty phase. To the contrary, in Ake, the State relied on psychiatric testimony establishing *1097 the petitioner's future dangerous behavior.
Third, Nixon failed to demonstrate that his sanity at the time of the offense was to be a significant factor at trial. From an abundance of caution the trial judge made the following express ruling:
So the defendant called no witnesses to present any evidence or testimony to support the motion for psychological examination. Consequently, there has been no showing of any kind to the Court that there would be any practical likelihood that that kind of examination would be helpful other than just a naked assertion of that but not supported by any evidence or testimony. There has been no contention filed at any time through this trial that the defendant was insane, and no insanity defense was presented. Both of those factors are quite distinguishable between this case and the Ake case.
Based on those distinguishing factors, and knowing of no other authority which would grant relief to Nixon, this Court concludes that there was no error in the trial court's ruling.

XIII.

Did the trial court violate the principles of double jeopardy in allowing the "pecuniary gain" aggravating circumstance?
The murder of Virginia Tucker was elevated to the status of capital murder because it was perpetrated by one who had been offered or who had received something of value for the killing. Miss. Code Ann. § 97-3-19(2)(d) (Supp. 1986). Likewise, one of the factors the jury considered and found present in agreeing on the death penalty was that the offense was committed for pecuniary gain. Miss. Code Ann. § 99-19-101(5)(f) (Supp. 1986).
Nixon contends the "double use" of the pecuniary gain factor is unconstitutionally overbroad and in violation of his rights against double jeopardy. This argument is a variation of the frequent argument that use of the underlying felony as an aggravating circumstance unfairly skews the sentencing process.
Both sides agree that Nixon's contention has frequently been considered and rejected by this Court and the Fifth Circuit Court of Appeals. See, e.g., Billiot v. State, 454 So.2d 445, 465 (Miss. 1984); Leatherwood v. State, 435 So.2d 645, 650 (Miss. 1983); Tokman v. State, 435 So.2d 664, 668 (Miss. 1983); Wingo v. Blackburn, 783 F.2d 1046 (5th Cir.1986).
Absent an unforeseen change in the point of view of the majority of the Court, stare decisis dictates that this assignment of error fail.

XIV.

Did the submission to the jury of the aggravating circumstance of "especially heinous, atrocious or cruel" suffer from a fatal overbreadth?
This Court has numerous times held the "especially heinous, atrocious or cruel" provision of Miss. Code Ann. § 99-19-101(5)(h) (Supp. 1986) is not so vague and overbroad as to violate the United States Constitution. Wiley v. State, 484 So.2d 339, 353 (Miss. 1986); Mhoon v. State, 464 So.2d 77, 84 (Miss. 1985) and cases cited therein.
Notwithstanding those decisions, this Court's construction of "especially heinous, atrocious or cruel," has not been without criticism. See, e.g., Wiley v. State, 484 So.2d 339, 358-361 (Miss. 1986) (Robertson, J. concurring).
The jury was allowed to consider whether Nixon's crime was "especially heinous, atrocious or cruel" only after those terms were defined in sentencing instruction 2 which read, "The Court instructs the Jury that the term `especially heinous, atrocious, or cruel', as used elsewhere in these instructions is defined as being a conscienceless or pitless (sic) crime which is unnecessarily torturous to the victim."
The facts of the instant case indicate that Mr. Nixon forcibly entered the house of a couple who feared he was there to kill them; Nixon fired several shots at Mr. Tucker in the presence of Mrs. Tucker; *1098 Mrs. Tucker was wrestled to the floor in preparation for her murder; Nixon held a pistol an inch from Mrs. Tucker's head and fired a bullet into her brain; Mrs. Tucker was left to die, but was found within one-half hour bleeding from the mouth and nose and gasping for breath; and Mrs. Tucker struggled to live but died the next day.
This Court holds that the facts of the instant case warranted the submission of the "especially heinous, atrocious or cruel" aggravating factor and that the trial court committed no error on this point. See Evans v. Thigpen, 631 F. Supp. 274, 285 (S.D. Miss. 1986) (The mental anguish and psychological torture suffered by the victim prior to the infliction of the death-producing wound may be considered with respect to the "heinous, atrocious or cruel" factor and make its application constitutionally unobjectionable).

XV.
During the penalty phase of Nixon's trial, the State sought to introduce as an aggravating circumstance Nixon's prior felony conviction "involving the use or threat of violence to the person." See, Miss. Code Ann. § 99-19-101(5)(b) (Supp. 1986). Defense counsel objected to the introduction of the prior conviction on grounds that the record was not given to the defendant as part of the aggravating circumstance material[4] and that the prior record reflected the name "John B. Nixon" instead of "John B. Nixon, Sr." Nixon's objections were overruled.
The prior conviction introduced by the State was a 1958 Texas rape conviction in which Nixon pled guilty and was sentenced to fifteen years in prison. On appeal, Nixon contends the introduction of the prior rape conviction was error because (A) the prior conviction was for a non-violent "statutory rape" and (B) the prior conviction was facially invalid.
Initially the State contends these points are procedurally barred because they were not the subject of Nixon's trial objections. Notwithstanding the absence of objections on the specific points raised on appeal, this Court proceeds to the merits.

A.

Was the Texas rape non-violent?
The indictment under which Nixon pled guilty stated as follows:
The grand jurors for the County of Brazoria ... upon their oaths present in and to said court that John B. Nixon on or about the 1st day of March, A.D. 1958, ... did then and there unlawfully in and upon Mary Jo Polk, a female then and there under the age of eighteen years, make an assault, and the said John B. Nixon did then and there ravish and have carnal knowledge of the said Mary Joe Polk, the said Mary Jo Polk not being then and there the wife of the said John B. Nixon... .
The applicable rape statute, Tex.Penal Code Ann. § 1183 (Vernon 1918) (repealed 1973), read as follows:

Rape is the carnal knowledge of a woman without her consent obtained by force, threats or fraud; or the carnal knowledge of a woman other than the wife of the person having such carnal knowledge with or without consent and with or without the use of force, threats or fraud, such woman being so mentally diseased at the time as to have no will to oppose the act of carnal knowledge, the person having carnal knowledge of her knowing her to be so mentally diseased; or the carnal knowledge of a female under the age of eighteen years other than the wife of the person with or without her consent and with or without the use of force, threats or fraud; provided that if she is fifteen years of age or over the defendant may show in consent cases she was not of previous chaste character as a defense.
(Emphasis added)
According to Nixon, "[t]here is absolutely no doubt that this was a conviction for *1099 Statutory Rape" and was therefore not a crime involving the threat or use of violence.
The indictment under which Nixon was convicted states Nixon made an "assault" on his victim and he "ravished" and had carnal knowledge of the victim. According to Texas caselaw, "[t]he word `ravish' implies force and want of consent, and its use in the indictment in connection with the allegation of rape of a female between the ages of fifteen and eighteen years ... renders the indictment sufficient to support a conviction for rape by force as well as for statutory rape." Rodrigues v. State, 166 Tex.Cr.R. 1, 308 S.W.2d 39, 40 (1958).
In Nixon's rape case, no force was needed to convict him because his victim was under eighteen years of age. However, the indictment to which he pled guilty alleged he assaulted and ravished his victim. Because those terms were used and were not required, this Court holds that the logical conclusion is that Nixon's rape involved force and want of consent and was therefore not a "statutory rape" as he contends.
When considering whether Nixon's prior offense was one involving the use or threat of violence the Court should be mindful that it behooves the prosecutor to prove the existence of each aggravating circumstance beyond a reasonable doubt. Miss. Code Ann. § 99-19-103 (Supp. 1986).

B.

Was the Prior Conviction Facially Invalid?
Here the Court is asked to render guidelines for determining the admissibility of prior felony records to establish aggravating circumstances under Miss. Code Ann. § 99-19-101(5)(b) (Supp. 1986). This Court has announced the following procedure in Phillips v. State, 421 So.2d 476 (Miss. 1982).
In Phillips, the prosecution sought to use a prior Kentucky conviction to enhance the defendant's punishment under Miss. Code Ann. § 99-19-81, as amended. The defendant objected to the use of the Kentucky conviction alleging that the conviction was invalid because he had not "knowingly and voluntarily" pled guilty. In response to Phillips' argument, this Court held that the trial judge is not required to go beyond the face of the prior convictions sought to be used in establishing a defendant's status as an habitual offender. "If, on its face, the conviction makes a proper showing that a defendant's prior plea of guilty was both knowing and voluntary, that conviction may be used for the enhancement of the defendant's punishment under the Mississippi Habitual Offender Act." Phillips, 421 So.2d at 481. See also, Moore v. State, 508 So.2d 666 (Miss. 1987).
In the instant case the record reflects that:
John B. Nixon in open court, in person, pleaded guilty to the charge contained in the indictment, thereupon the said Defendant was admonished by the Court of the consequences of said plea, and the said Defendant persisted in pleading guilty; and it plainly appearing to the Court that the said Defendant is sane, and that he is uninfluenced in making said plea by any consideration of fear, or by any persuasion, or delusive hope of pardon prompting him to confess his guilt, the said plea of guilty is by the Court received and here now entered of record upon the minutes of the Court as the plea herein of said Defendant.

C.
If the Court had found that the introduction of Nixon's prior rape conviction as an aggravating circumstance was improper, Nixon contends his death sentence must be reversed. This Court has rejected that argument. Even if this Court did so determine, reversal would not necessarily follow.
Relying on Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), this Court has held numerous times that where a death penalty is supported by several aggravating circumstances, the invalidity of one of those circumstances will not constitutionally impair the sentence. *1100 See e.g., Stringer v. State, 500 So.2d 928, 945 (Miss. 1986); Irving v. State, 498 So.2d 305, 314 (Miss. 1986).
In the instant case, the jury found two other aggravating circumstances  (1) the capital offense was committed for pecuniary gain and (2) the capital offense was especially heinous, atrocious and cruel.
For those reasons, the Court holds the introduction of Nixon's prior rape conviction was not reversible error.

XVI.

Was Nixon entitled to a "mercy" instruction?
Conceding his argument has been previously rejected by this Court, Nixon contends he was entitled to a jury instruction informing the jury of its option to recommend a life sentence, even where the aggravating circumstances outweighed the mitigating circumstances. Identical arguments were rejected by this Court in Wiley v. State, 484 So.2d 339, 349 (Miss. 1986); Johnson v. State, 477 So.2d 196, 221 (Miss. 1985); Cabello v. State, 471 So.2d 332, 348 (Miss. 1985); Jordan v. State, 464 So.2d 475, 479 (Miss. 1985); Hill v. State, 432 So.2d 427, 442 (Miss. 1983).
Nixon's complaint stems from the trial court's refusal of jury instruction D-13 which the trial judge held was redundant with instruction D-3. Jury instruction D-3 read, "The Court instructs the jury that you need not find any mitigating circumstances in order to return a sentence of life imprisonment."
Clearly Nixon was in fact afforded a mercy instruction which gives Nixon no basis upon which to complain.

XVII.

Was there prosecutorial misconduct during the penalty phase?
Nixon contends the following language by the district attorney during the open statement of the penalty phase was a violation of the prosecutor's privilege:
Ladies and Gentlemen, at this stage of the trial the State has an opportunity to present further evidence to you as to what are aggravating circumstances. Aggravating circumstances are circumstances that weigh against the Defendant as far as penalty and that ought to be considered against him for that purpose. We say that under those matters that the legislature has said are aggravating circumstances that the proof will support three.... Number two, this capital murder was especially heinous, atrocious or cruel. I think the evidence will bear out that there can be no case that would be more atrocious, heinous or cruel... . We believe that once we have adduced our evidence that you will see that the aggravating circumstances outweigh any mitigating circumstances that might be presented and that he ought to be given a penalty of a death sentence on account of his crime. Thank you. (Emphasis added).
Prosecutors should refrain from interjecting personal beliefs into the presentation of their cases. U.S. v. Young, 470 U.S. 1, 8, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 8 (1985).[5] A prosecutor may strike hard blows, but he is not at liberty to strike foul ones. Berger v. U.S., 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).
This Court holds that the blows struck by the prosecutor were neither hard nor foul. Likewise, the language does not even approach the threshold of reversibility.
Next, Nixon complains of the prosecutor's invoking of the "Code of Moses". While Nixon contends that an argument which invites the jury to consider religion as relevant is improper, Nixon fails to mention his own attorney was the first to inject religion into the trial.
Pleading for mercy, defense counsel made comparisons to Cain and Abel, Moses, King David, Saul/Paul and finally to Jesus Christ. (R. 580-582) Afterward, the district attorney distinguished the circumstances surrounding Jesus Christ, Cain and Abel, and Moses and concluded:

*1101 The only killings that I know from my Bible that happened were acts of war or in self-defense against Goliath. You can rely on your own memory in that regard, but I am simply saying all of this to say this: that that has no application to this. I ask you to dispassionately consider the law that the Court has given you. The facts is your domain. The law is the Court's domain. The Judge has told you in the instructions to dispassionately view the aggravating circumstances that are proved on one hand and mitigating circumstances on the other hand and see which ones outweigh each other in your view and render a sentence accordingly. Why should you do that instead of ruling on some emotionalizm (sic) for the State or for the Defendant? But, if you will follow the law and the guidelines on it, it will promote consistency. You see, if another capital murder happens here or in some other county of this State, that Defendant on trial deserves the same fair trial that this Defendant deserves. If juries will follow the guidelines of the law, then death penalties or life sentences will be given in a consistent manner with some rhyme or reason behind them and not that this jury said, "Well, I feel sorry for his mother," or whatever. (Emphasis added).
This Court holds that conduct of the district attorney dictates no reversible error.

XVIII.

Was the jury incompetent due to misperceptions concerning parole eligibility?
Nixon contends the "prosecution illegitimately injected the notion of parole into the trial of the case" through the testimony of Gilbert Jimenez who testified, "I told [my girlfriend] I was going to kill myself. She said, `That (sic) no way to go about it. Just go back over there and take your punishment. They can't keep you forever.'"
These statements, to which not even a hearsay objection was raised, were directed toward explaining why Jimenez chose to cooperate instead of running from the police. The statements were addressed to Jimenez's participation in the murder and were no way directed toward the parole eligibility of John Nixon, Sr.
This Court holds there was no error befell Nixon because of these statements and thus that this assignment is without merit.

XIX.

Was Nixon denied his Sixth Amendment Right to Counsel during the hearing of his motion for new trial?
On the morning Nixon's motion for a new trial was to be argued, Nixon requested his attorneys, Tabb and Townsend, be discharged and that Mr. Clive A. Stafford Smith (counsel on appeal) be appointed. Mr. Smith was not present in court but he had filed, via Mr. Ken Rose, a motion for continuance to allow himself thirty days to have transcribed and to become familiar with the trial record. In light of those events, Mr. Townsend moved ore tenus to withdraw as Nixon's counsel.[6]
After being assured that Nixon did not wish to proceed pro se, and after being assured by Mr. Townsend that he had adequately prepared for the hearing and that he would perform his representation to the best of his ability, the trial judge overruled Nixon's motion to discharge his attorneys and Mr. Townsend's motion to withdraw as counsel. The trial judge was concerned with the disorderly administration of justice that would follow if criminal defendants were allowed to change lawyers at the last minute for the purpose of causing delay.
Subsequently, Mr. Townsend presented his arguments supporting the motion for new trial, but the motion was overruled. On appeal, Nixon contends his Sixth Amendment right to counsel during the motion for new trial was denied. This Court disagrees.
*1102 "Although the Sixth Amendment right to counsel in criminal cases is absolute, an accused's right to a particular counsel is not." Richardson v. Lucas, 741 F.2d 753, 756 (5th Cir.1984). A defendant's interest in obtaining counsel in whom he trusts must co-exist with the court's authority to maintain judicial proceedings in an orderly manner. Lockett v. Arn, 740 F.2d 407 (6th Cir.1984); see generally, LaFave and Israel, Criminal Procedure, § 11.4, pp. 38-40 (1984).
The instant record reflects that approximately thirty days had elapsed between Nixon's filing his motion for new trial and the hearing on said motion. In addition, no action to change counsel was taken until the eve of the hearing.
To prevail on his claim of ineffective assistance of counsel at the hearing on the motion for new trial, Nixon must satisfy the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. (Emphasis added) See also Odom v. State, 498 So.2d 331, 334 (Miss. 1986); Coleman v. State, 483 So.2d 680, 682 (Miss. 1986).
Having reviewed the record, this Court concludes that Nixon has failed to meet either component of the Strickland v. Washington test. Therefore, this Court holds there is no error under this assignment.

XX.

Does the cumulative effect of the alleged errors warrant reversal?
This Court finds no reversible error in the instant record. Even considering the greater scrutiny given death penalty cases this Court concludes there is nothing in this record to warrant reversal.
Pursuant to Miss. Code Ann. § 99-19-105(3)(a), (b), (c) and (5) and the decisions of this Court and the Federal courts on imposition of the death penalty, this Court has reviewed the record in this case and has compared it and the death sentence imposed in the cases decided by this Court since Jackson v. State, 337 So.2d 1242 (Miss. 1976), which cases are set forth in Appendix A.
We now hold that after a review of the cases coming before this Court, and comparing them to the present case, the punishment of death is not too great when the aggravating and mitigating circumstances are weighed against each other and the death penalty will not wantonly or freakishly be imposed here.
We find and conclude that the death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor, that the evidence supports the jury's finding of statutory aggravating circumstances under § 99-19-101 and that the sentence of death is not excessive or disproportionate to the penalty imposed in those cases since 1976, considering both the crime and the manner in which it was committed and the defendant; that the death penalty imposed on Nixon is consistent and even-handed to like and similar cases; and that the sentencing phase followed in his trial provided a meaningful basis for distinguishing the few cases in which the death penalty is imposed and the many cases in which it is not imposed.
This Court affirms both the guilt and sentencing phases of this trial and therefore, *1103 affirms the conviction of John Nixon, Sr. on charges of capital murder and the imposition of the death penalty. The date of Wednesday, December 16, 1987, is set as the date of the execution of the sentence and the infliction of the death penalty in the manner provided by law.
AFFIRMED. WEDNESDAY, DECEMBER 16, 1987, SET FOR EXECUTION OF THE DEATH PENALTY.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and ANDERSON, and GRIFFIN, JJ., concur.
SULLIVAN, J., HAWKINS, P.J., AND ROBERTSON, J., concur in part and dissent in part.
SULLIVAN, J., dissents to assignments VII A and XIX.
HAWKINS, P.J., joins part II of dissent.
ROBERTSON, J., joins part I of dissent.
ZUCCARO, J., not participating.

APPENDIX "A"

DEATH CASES AFFIRMED BY THIS COURT:
Williams v. State (Miss. Oct. 10, 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Jones v. State, 517 So.2d 1295 (Miss. 1987).
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE:
Davis v. State, 512 So.2d 1291 (Miss. 1987)
Williamson v. State, 512 So.2d 868 (Miss. 1987).
*1104 Smith v. State, 499 So.2d 750 (Miss. 1987).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
SULLIVAN, Justice, dissenting:
I concur with the majority opinion except those portions which deal with Assignments VII(A) and XIX, to which I respectfully dissent.
I dissent because the prosecutor's failure to honor either the dictates of Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice or his own word constitutes reversible error. Further, I dissent because Nixon was denied his Sixth Amendment right to effective assistance of counsel at the hearing on his Motion for New Trial.

I.
On March 26, 1986, the appellant's capital murder trial was completed. Nixon was dissatisfied with his attorneys at trial, Townsend and Tabb. He discussed this with Townsend at Parchman and informed Townsend of his desire to retain another attorney to represent him.
On behalf of Nixon, Clive A. Stafford Smith, an attorney from Atlanta, filed a motion for continuance. This motion set out the circumstances which had prevented Nixon from contacting Smith sooner. Among the allegations in the motion for continuance was the allegation that Townsend had acted in a manner inconsistent with effective, conflict-free representation. Smith asked for a thirty day continuance during which he could study the transcript and prepare to argue Nixon's motion for a new trial.
The motion for continuance was shown to the trial judge and was the subject of much discussion at the motion hearing. At the hearing Nixon stated, "I would like to discharge Townsend and Tabb. I would like for them to have no further interest in my case at all." The trial judge expressed his concern that this was merely a delaying tactic employed by Nixon. Nixon answered, "I am very uneducated in these matters, and I don't know what else to do ... I am on death row up there now, and I don't want to take any more chances."
The trial judge then presented Nixon with a choice  either proceed with Townsend as counsel or represent yourself. Obviously untrained to undertake such a task, Nixon declined to represent himself. Aware of the conflict of interest, Townsend and Tabb both wished to be excused from further representation of Nixon. (Tabb was not present at the hearing but he had discussed this matter with Townsend and *1105 both were in agreement). Townsend repeatedly informed the court of the conflict of interest and asked to be excused from further representation of Nixon.
Without addressing the conflict of interest claim the trial judge denied Townsend's motion to withdraw as counsel and Nixon's motion to substitute counsel. Townsend again asserted that Nixon had a right to substitute counsel and pointed out to the judge that he (Townsend) was not even communicating with Nixon because of the possible conflict of interest.
After establishing that Townsend would zealously represent Nixon, the trial judge put Townsend under oath and began questioning him about the motion for continuance submitted by Clive A. Stafford Smith on Nixon's behalf. Townsend testified about the circumstances surrounding his trip to Parchman to consult with Nixon. Townsend also revealed the substance of his consultation with Nixon.
Nixon was denied his Sixth Amendment right to counsel at the hearing on his motion for new trial because Townsend was actively representing conflicting interest at that hearing and because Townsend breached his duty of loyalty by testifying against Nixon's interests. See Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).
The Sixth Amendment right to counsel undoubtedly includes right to counsel who is free from any actual conflict of interest. Bridges v. United States, 794 F.2d 1189, 1192 (7th Cir.1986), citing Strickland v. Washington, 466 U.S. 668, 684-686, 104 S.Ct. 2052, 2062-2064, 80 L.Ed.2d 674 (1984); United States v. Cronic, 466 U.S. 648, 653-657, 104 S.Ct. 2039, 2043-2046, 80 L.Ed.2d 657 (1984); Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). This "right to conflict free counsel encompasses all stages of a criminal proceeding." Bridges, supra, citing Holloway v. Arkansas, 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978).
At the motion hearing Townsend repeatedly informed the trial judge of the conflict of interest and asked to be excused from representation. The trial judge compelled Townsend to continue to represent Nixon. In Glasser v. United States, the Supreme Court stated:
Of equal importance with the duty of the court to see that an accused has the assistance of counsel is his duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed even suggesting that the counsel undertake to concurrently represent interest which might diverge... .
Glasser v. United States, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).
Addressing the issue of conflict of interest in Cuyler v. Sullivan, supra, the Supreme Court held:
Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial... . Trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel.
Cuyler v. Sullivan, 446 U.S. 335, 346-47, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980); see also, Burger v. Kemp, Warden, ___ U.S. ___, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).
Among the basic duties which defense counsel owes his client is the duty of loyalty and the duty to consult with the defendant on important decisions. Strickland v. Washington, 466 U.S. at 690, 104 S.Ct. at 2065. Townsend refused to consult with his client and also took the stand and testified against his client's interest. If Townsend was Nixon's attorney, then who was representing him while Townsend testified against his interest?
When defense counsel has breached his duty of loyalty by actively representing conflicting interests and the conflict of interest adversely affects his performance then prejudice is presumed. Cuyler v. Sullivan, supra, 446 U.S. at 348-50, 100 S.Ct. at 1718-19; Strickland v. Washington, 466 U.S. at 692, 104 S.Ct. at 2067; Burger v. Kemp, ___ U.S. ___, ___, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987).
*1106 The Fifth Circuit has defined the term "actual conflict" in Zuck v. Alabama, 588 F.2d 436 (5th Cir.1979), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). The court stated, "An actual conflict of interest occurs when a defense attorney places himself in a situation inherently conducive to divided loyalties." Zuck, at 439, citing Castillo v. Estelle, 504 F.2d 1243 (5th Cir.1974).
In the case at hand it was against Townsend's pecuniary and professional interests to assert Nixon's claim that he (Townsend) was ineffective. Townsend viewed himself as adverse to Nixon (his client), he informed the court of this, and admitted that he was not even speaking to Nixon. Further, Townsend acted in a manner completely inconsistent with his role as an advocate by testifying against Nixon's interest.
Townsend's representation of Nixon was ineffective under any standard. However, it was especially so in light of the conflict of interest issue which the majority completely fails to address. Following Cuyler, Holloway, Strickland, and Burger, I would hold that, at a minimum, Nixon is entitled to a full and fair hearing on all issues which should be presented through a motion for new trial and a new direct appeal.

II.
The majority correctly holds the State violated Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice by withholding from the defense a statement made by the defendant which the State used against him during his trial. However, the majority dismisses this assignment because Nixon's attorney failed to comply with the guidelines enunciated in Box; the judge granted a continuance; and it finds this case indistinguishable from Cole v. State, 525 So.2d 365 (Miss. 1987); and Cabello v. State, 471 So.2d 332, 343 (Miss. 1985) (in which this Court enforced the guidelines enunciated in the Box concurrence against capital defendants).
The record reflects that Nixon's attorney failed to make a timely objection to the introduction of Nixon's alleged statement. The record also reflects that the prosecution had made an affirmative misrepresentation that no such statement existed and had promised to inform the defendant if the State became aware of such a statement. (At the time that the prosecution made this promise to Nixon's attorneys they had known of Nixon's statements for at least one month.)
When the State finally supplied Nixon with the requested information, it was delivered in the form of hearsay testimony against him at his trial. The ambush was successful. Because of the prosecutor's misrepresentations Nixon's attorneys were not prepared to contest the admissibility of the statement. Considering the facts of this case, it seems incongruous to invoke a procedural bar to cover the prosecution's violation of a substantive rule.
The majority applies the guidelines from Box v. State, 437 So.2d 19, 23-24 (Miss. 1983), (Robertson, J., concurring), and apparently decides that Nixon was not entitled to a mistrial. I am troubled by this Court's indiscriminate application of the Box guidelines. The majority and concurring opinions in Box clearly contemplate a situation in which the undisclosed evidence is given to the defendant before being introduced into evidence. In Box, the prosecution had failed to disclose the identity of a witness and the existence of some photographs (both of which would come to the attention of defense counsel before they would be put before the jury). Further, the majority finds the case at bar to be indistinguishable from Cole v. State, supra, and Cabello v. State, supra. In Cole v. State, the prosecution had failed to disclose the identity of a witness, and the defense was given the opportunity to interview her before she was allowed to testify. Cole, at 3. Likewise in Cabello, the prosecution had not disclosed the identity of a witness and the defense was given an opportunity to test the undisclosed witness before he took the witness stand. Cabello, at 343. The salient difference between the cases upon which the majority relies and the case at bar is that John B. Nixon, Sr., *1107 had no opportunity to make use of the impermissibly withheld evidence before it was given to the jury.
When the State (as in Box, Cole, and Cabello) calls a witness whose name was not furnished pursuant to Rule 4.06, defense counsel is immediately informed of the discovery violation by the calling of the witness. Likewise when the State produces tangible evidence such as photographs or written statements which have been illegally withheld from the defense, the discovery violation is apparent before the evidence is given to the jury. Nixon's illegally withheld oral statement was given to the jury before defense counsel had any reason to know of its existence. The difference between providing a criminal defendant with a reasonable opportunity to make use of previously undisclosed evidence before it is used at trial and completely surprising him with such evidence during the course of the trial is the difference between principled orderly discovery and trial by ambush. Nixon was a victim of the latter.
The fact that Nixon's attorneys were given the night recess to attempt to repair the damage done by the ambush is of little consequence. Although a continuance might have been helpful before the illegally withheld evidence was put before the jury, Nixon's attorneys decided that under the circumstances a further continuance would be of no use. The trial court offered to let Nixon recall Tucker to the stand, defense counsel decided that this would serve only to reiterate the damaging testimony and declined to do so. Realizing that they could not "unring the bell" Nixon's attorneys moved for a mistrial. Under Rule 4.06 they were entitled to a mistrial.
In his Box concurrence, Justice Robertson lamented the dilution of Rule 4.06 and expressed his hope that the guidelines in that concurrence would "secure enforcement of Rule 4.06...." Box at 23. However, it has become apparent that our increasingly mechanistic application of those guidelines is negating our commitment to principled, timely pretrial discovery. The Box guidelines have created a safe harbor for prosecutors who refuse to comply with the requirements of Rule 4.06. By withholding until trial evidence which the defense is entitled to, the State (under the Box guidelines) places the defendant in a procedural minefield from which he must escape unscathed if he would obtain review of the State's violation of Rule 4.06.
Further, the majority's application of Box seems to indicate that a continuance is always sufficient to cure the State's discovery violation. In Box, Justice Robertson stated, "Where no motion for a continuance is made, the Rule 4.06 issue should be deemed waived for purposes of appeal." Box at 25. Contra, Cole v. State, 525 So.2d 365 (Miss. 1987) (Robertson, J., concurring), ("Where no motion for a continuance or mistrial is made, the Rule 4.06 issue should be deemed waived for purposes of appeal.") (Emphasis added). Rule 4.06 states that the court may "grant a continuance, or enter such other order as it deems just under the circumstances." Rule 4.06, Uniform Criminal Rules of Circuit Court Practice. Apparently, Nixon's motion for mistrial can be denied simply because it was not a motion for continuance. By making a continuance the sole relief available under Rule 4.06 the majority ignores both the realities of a criminal trial and the rule itself.
None of the cases cited by the majority support the proposition that the trial judge was correct in denying Nixon's motion for mistrial. Indeed, Nixon was entitled to a mistrial; if the Box guidelines would work to deny him that, then they would emasculate Rule 4.06 and they are at odds with this Court's commitment to pretrial discovery. Believing that the trial judge erred in not granting Nixon's motion for mistrial, I would reverse and remand this case for a new trial.
ROBERTSON, J., joins in part I of this dissent.
HAWKINS, P.J., joins in part II of this dissent.
NOTES
[1] Virginia Tucker was the former wife of Joe Ponthieux.
[2] The record does not reflect the exact time of recess, but the trial judge indicated earlier he planned to recess at 4:00 p.m.
[3] See Box v. State, 437 So.2d 19, 23-24 (Miss. 1983) (concurring opinion).
[4] Defense counsel admitted the prior record was tendered to them. They simply argued that the record was not highlighted as being for the purpose of an aggravating circumstance.
[5] See also ABA Standards for Criminal Justice 3-5.8(b) (2d ed. 1980).
[6] Attorney Christopher Tabb was not present at the hearing on Nixon's motion for new trial.