[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 112 
¶ 1. Phillip Young was convicted of carjacking following his trial by jury on November 12, 2002, in the Circuit Court of Sunflower County. He was sentenced to a term of fifteen years in the custody of the Mississippi Department of Corrections, with ten years to serve and five years suspended and five years' post-release supervision. Young was also ordered to pay court costs in the amount of $530, $250 to the crime victims' compensation fund, and a fine of $1,000. The circuit court denied Young's motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial. Aggrieved, Young appeals. Finding no error, we affirm.
 FACTS ¶ 2. Young was indicted by a Sunflower County grand jury on December 28, 2001, for one count of carjacking and two counts of aggravated assault. On February 4, 2002, the court entered a pretrial order overruling Young's motion to suppress identification testimony, finding "under the totality of the circumstances, the eyewitness identifications were not tainted and should not be suppressed." A trial was held on November 12, 2002, at which time three of the State's witnesses positively identified Young as being the driver of the green Maxima in question.
 ¶ 3. Specifically, Martha Grant testified that she and Jerry Parker, her boyfriend at the time and husband at the time of trial, were washing their vehicles at the Double Quick car wash on Highway 82 in Indianola, Mississippi, on November 9, 2001. Grant's vehicle, a white Bonneville, was parked in one stall and both Grant and Parker were washing it and the green Maxima, Parker's vehicle, was parked in the stall next to them. At the time of the carjacking, Parker had asked Grant to get some more change from the Maxima so that they could finish washing the Bonneville. Grant testified that after she retrieved the change from the Maxima, she was approached by Young from behind and as she turned around Young shoved her and said "give me those damn keys." Grant then testified that Young "snatched them out of her hand" and she ran to tell Parker what had happened. Grant further *Page 113 
testified that the Maxima stalled as Young tried to drive off and she and Parker had a clear view of Young and he was "grinning at them." According to Grant, she and Parker then got in the Bonneville and pursued the Maxima down Highway 82 toward Greenville and then onto Road 448 going toward Shaw. At some point on 448, the driver of the Maxima turned off the road and parked briefly, but then turned around and met the Bonneville head on and hit the passenger side of the Bonneville before continuing toward Shaw. No one involved was injured. Grant testified that as she and Parker followed the Maxima they shouted to a friend passing, "Somebody stole Jerry's car. Call the police." Grant further stated that after the Maxima had hit them they stopped at a lady's house somewhere on Road 448 and called the police. According to Grant, the police said they had already received a call about the incident and they were "on their way out there looking for him." Grant said next they went to the Indianola Police Station to give their statements. While at the station, the police brought in Young, in handcuffs, and Grant testified that she stated, "that's him." She further stated that no one at the station specifically pointed Young out to her or asked her to identify him. Grant further identified Young in court as the man who had shoved her and driven off in the Maxima from the Double Quick, and as the same man who ran into her and Parker on the county road while they were in pursuit of the Maxima.
 ¶ 4. The State then presented testimony by Parker, who corroborated Grant's testimony regarding his and Grant's presence at the Double Quick on Highway 82 and that a man drove off in the Maxima while they were there attempting to wash their cars. Specifically, Parker testified that after Grant told him that someone had just stolen his car, he ran to the stall where the Maxima was parked and that the car had stalled as Young was attempting to drive off. Parker stated, "I was standing in front of the car. I was looking at the guy that was in the car, and he was looking at me laughing." He stated that once the car quit stalling, Young drove right toward him and he had to jump out of the way to keep from being hit. Parker testified that he was about five feet from the front of the Maxima when Young drove off and that he got a good look at the driver for about fifteen seconds. Parker further corroborated Grant's testimony regarding their pursuit of the Maxima and also testified that Young was the driver of the Maxima as it sideswiped them on the county road. Parker testified that after they abandoned their pursuit and called the police, they went to the Indianola Police Station and that while they were there the police brought Young in, in handcuffs. Parker testified that upon seeing Young at the police station, "I told the police officer, the guy that I made the report out to, I told him `that's the guy that stole my car.'" Parker also identified Young in the courtroom as the man who drove off in his car at the Double Quick and the same driver as was out on the county road.
 ¶ 5. Robert Sanders, a motor carrier inspector for the State of Mississippi and witness for the State, testified that he was patrolling in Bolivar County when he heard over the radio that a stolen car was coming out of Sunflower County into Bolivar. Sanders said he positioned himself at an intersection right outside the city limits of Shaw and shortly thereafter saw a green Maxima "coming off 448, with other law enforcement officers in pursuit of it." Sanders further testified that the Maxima then "turned right onto Dean Boulevard, I was there at the intersection . . . came within a few feet of my vehicle, saw my unit, panicked, made a left turn into the *Page 114 
Wild Bill's parking lot." He stated that he had a clear view of the driver because their vehicles were "side by side, heading in opposite directions, which put the driver on my side of my vehicle," and he then identified Young in the courtroom as the driver of the Maxima. Sanders then testified that after about fifteen or twenty minutes and still within the city limits of Shaw, a message came across the radio that "[the carjacker] had been located on the south side of Shaw . . . and that the vehicle that he was driving was parked in Mr. Clifton Anderson or Ms. Rosie Anderson's driveway." Sanders said he then went to the location he had heard over the radio and that when he got there, "one of the City of Shaw police officers and other law enforcement officers had obtained this driver, and had put him into custody." Sanders further stated that the person detained was "identical" to the person he had seen driving the Maxima. Sanders also identified, in court, that Young was the driver that had met him in the Maxima, as well as the man the police had detained in Shaw.
 ¶ 6. Charles Smith, captain and chief of detectives with the Indianola Police Department, also testified for the State. Smith testified that he was aware of the carjacking due to radio reports he heard after he left work that Friday afternoon, however, he was not personally involved with the matter until the following Tuesday,[1] at which point he conducted interviews with Grant and Parker. Smith stated that both Grant and Parker "positively identified the suspect by photograph" and that the individual they identified was Young. Smith testified that because the Maxima was recovered in Shaw and later carried back into Sunflower County by a wrecker service, he did not attempt to obtain any fingerprints from the Maxima. It was his opinion that after the time lapse of when he saw the vehicle and the fact that others had been inside the vehicle he would not have been successful in getting any fingerprints off the Maxima that would have been of any use. Smith testified that he was not aware of any video surveillance at the Double Quick until the preliminary hearings began involving this matter. Once he became aware of the possible videos, he testified that he called the Double Quick and the manager informed him that the tapes had been recorded over. After the State admitted Smith's report into evidence, he read the "details" portion aloud to the court which was his summation of Grant and Parker's interviews with him. In pertinent part the report stated, "the defendant was brought back to the Indianola Police Department by Deputy Sheriff Doug Grantham, where he came in contact with the victims who were at the Indianola P.D. filing a report with Sergeant Robert Kirklin. Both of the victims indicated to Sergeant Kirklin that the person that was with Deputy Grantham was the one who had taken the car from victim Grant and also hit the victim Parker."
 ¶ 7. At the close of the State's case-in-chief, Young's appointed counsel made a motion for directed verdict, which the court denied. Young's counsel presented three witnesses, including Young. He first called Captain Smith and questioned him regarding Smith's investigation into the voluntary statement Young gave after he was given his Miranda rights. Smith testified that he had attempted to locate Jessie Warren, the individual that Young indicated he was in Shaw with prior to his arrest; however, Smith was unsuccessful *Page 115 
in locating him. Officer Robert Kirklin, with the Indianola Police Department, then testified for the defense regarding his involvement. Kirklin stated that he had taken the original complaint from Parker and Grant regarding the carjacking and had then contacted his investigator, Captain Smith, who took charge of the matter from that point. Kirklin testified that the complaint contained the name "Earl Conrad" because Grant had named him and thought "he might have been the suspect, but she wasn't sure."
 ¶ 8. Phillip Young, after being advised of his right to testify or not in his own defense, took the witness stand and gave his version of what happened on November 9, 2001, prior to him being arrested. According to Young, he had ridden into Shaw with Jessie Warren. Young stated he knew Warren because they had previously worked together. He testified that they had been in Cleveland before coming to Shaw that day and that the last time he saw Warren was around 3:00 that afternoon. Young stated, "We was just stopping through, you know. And he told me that he was going to be right back in about fifteen or twenty minutes. I didn't want to wait on him; so next thing I know, I was going to jail." Young stated on direct examination that he was just standing around, looking to see what the police were doing when he was arrested. However, on cross-examination he stated that he had seen the police come by while he was standing outside a club and so he walked down closer to where the police were and that he "ended up getting into it with a few guys." He testified that he had not seen Warren since that day and he did not know where Warren was or how to contact him, although, he also stated he had been in jail since he was arrested.
 ¶ 9. The jury found Young guilty of carjacking and not guilty of the two aggravated assault charges. On November 15, 2002, the court sentenced Young to fifteen years in the custody of Mississippi Department of Corrections, with ten years to serve and five years suspended and five years' post-release supervision. Young was ordered to pay court costs in the amount of $530, $250 to the crime victims' compensation fund, and a $1,000 fine. Young's counsel filed a motion for JNOV or, in the alternative, a new trial which was overruled and denied by the trial court on November 21, 2002. On April 11, 2005, the trial court granted Young's motion for an out-of-time appeal finding that no appeal was ever filed by Young, pro se or by appointed counsel. It is under that order that Young, proceeding pro se and in forma pauperis, appeals to this Court asserting the following issues:
 I. Whether the verdict of guilty was against the overwhelming weight of the evidence and that the court erred in denying Young's motion for new trial.
 II. Whether the trial court erred by allowing the identification testimony regarding the alleged show-up.
 ISSUES AND ANALYSIS I. Whether the verdict of guilty was against the overwhelming weight of the evidence and that the court erred in denying Young's motion for new trial.
 ¶ 10. Young appears to be asserting not only a challenge of the weight of the evidence, but he also challenges the legal sufficiency of the evidence to support the jury's guilty verdict. Therefore, we will include a discussion of both the weight of the evidence claim and legal sufficiency of the evidence claim under this one assignment of error. *Page 116 
 ¶ 11. A motion for a new trial challenges the weight of the evidence. Beckum v. State, 917 So.2d 808, 812 (¶ 10) (Miss.Ct.App. 2005) (citing Carr v. State,774 So.2d 469, 472 (¶ 15) (Miss.Ct.App. 2000)). Upon review of a trial court's denial of a motion for a new trial, this Court must consider the evidence in the light most favorable to upholding the verdict. Id. at 813 (¶ 14). We will only reverse a trial court's decision when convinced that there was an abuse of discretion in failing to grant a new trial. Dudley v.State, 719 So.2d 180, 182 (¶ 7) (Miss. 1998) (citingHerring v. State, 691 So.2d 948, 957 (Miss. 1997)). We must also keep in mind that it is the jury's responsibility to resolve matters regarding the weight of the evidence and the credibility of witnesses. Beckum,917 So.2d at 813 (¶ 14). It is a fundamental principle of law that a jury verdict will not be disturbed except in the most extreme of situations. Washington v. State, 800 So.2d 1140,1144 (¶ 10) (Miss. 2001) (citing Manning v. State,735 So.2d 323, 333 (¶ 10) (Miss. 1999)). "Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal."Walker v. State, 881 So.2d 820, 831 (¶ 32) (Miss. 2004) (citing Dudley, 719 So.2d at 182 (¶ 8));Dilworth v. State, 909 So.2d 731, 737 (¶ 20-21) (Miss. 2005).
 ¶ 12. The standard of review for motions for directed verdict and JNOV is abuse of discretion. Smith v.State, 925 So.2d 825, 830 (¶ 10) (Miss. 2006) (citingBrown v. State, 907 So.2d 336, 339 (¶ 18) (Miss. 2005)). In considering whether the evidence is sufficient to withstand a motion for directed verdict, or a motion for JNOV, the court must determine that a reasonable, fair-minded juror could find that the accused committed the offense charged beyond a reasonable doubt, and that every element of that offense existed given the evidence presented. Brown,907 So.2d at 339 (¶ 8) (citing Carr v. State,208 So.2d 886, 889 (Miss. 1968)). If the evidence fails to meet this test then it is insufficient to support a conviction.Carr, 208 So.2d at 889. However, where substantial evidence of such quality and weight exists to support the verdict, and where reasonable and fair-minded jurors may have found the appellant guilty, we must affirm the judgment of the trial court. McClendon v. State, 852 So.2d 43, 47 (¶ 11) (Miss.Ct.App. 2002) (citing Baker v. State,802 So.2d 77, 81 (¶ 13) (Miss. 2001)).
 ¶ 13. Young argues that the State failed to prove the elements of the carjacking statute, Mississippi Code Annotated section 97-3-117(1) (Rev. 2006), which states the following:
 [w]hoever shall knowingly or recklessly by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, or attempting to do so, or by any other means shall take a motor vehicle from another person's immediate actual possession shall be guilty of carjacking.
Young asserts that because Grant testified that she was outside of the vehicle rather than inside, that she was not in "immediate actual possession" and, therefore, the State had not proven all of the elements of a carjacking. Young would have this Court find the words "immediate actual possession" to be very narrowly tailored, although he does not provide any precedent of such a narrow finding. We cannot agree that the legislature intended the statute be construed so literally as to mean that a person commits a carjacking only when an individual is physically inside the vehicle. In Walters v. State,932 So.2d 860, 861 (¶ 3) (Miss.Ct.App. 2006), the victim of an armed carjacking was approaching his car when Walters confronted him and ordered the victim into the car; however, *Page 117 
the victim refused, eventually was shot and Walters fled the scene in the victim's vehicle. Id. Though the present case was not an armed carjacking, the facts are similar because neither of the victims were physically inside the vehicle when the carjacking occurred. Grant had just retrieved some money from the vehicle and had the keys in her hand when she was approached by Young, who then demanded the keys from her, snatched them out of her hand and drove off. The record reveals the trial court heard arguments on Young's present assertion by his appointed counsel not less than three times and each time the trial court was not persuaded that the State had failed to prove the essential elements of the crime of carjacking.[2] We too are not persuaded that the State failed to prove the essential elements of the crime of carjacking. Therefore, we find that it was not reversible error for the trial court to allow the jury to consider the charge.
 ¶ 14. Furthermore, after a thorough review of the court record, we cannot say that the overwhelming weight of the evidence does not support the jury's finding that Young was guilty of carjacking, nor do we find that to allow the verdict to stand would be an unconscionable injustice. The jury is charged with weighing the evidence and determining the credibility of witnesses. Nobles v. State,879 So.2d 1067, 1071 (¶ 11) (Miss.Ct.App. 2004) (citing McClain v.State, 625 So.2d 774, 778 (Miss. 1993)). Sheffield v.State, 749 So.2d 123, 128 (¶ 17) (Miss. 1999), presents a similar situation where Sheffield argued for a new trial upon the grounds that the weight of the evidence presented did not support the jury's verdict. The court noted inSheffield that there was no need for the reviewing court to determine exactly which witnesses and testimonies the jury chose to believe or disbelieve in reaching its verdict.Id. Furthermore, it is enough that the evidence presented a factual dispute for the jury. Id. (citingGroseclose v. State, 440 So.2d 297, 300 (Miss. 1983)). In the present case, the jury heard three eyewitnesses testify that Young was the man they saw driving the green Maxima, and they also identified Young in court. The jury then had the opportunity to hear Young's recollection of what happened on November 9, 2001. Young argues that the State did not present any fingerprint evidence or an alleged video from the Double Quick surveillance cameras. Both of these evidentiary issues were addressed by Young's counsel during Captain Smith's testimony regarding his investigation of the matter. As stated in Sheffield, this Court cannot determine which witnesses the jury chooses to believe or disbelieve.Sheffield, 749 So.2d at 128 (¶ 17). The jury had the duty to discern what witness's statements to believe or disbelieve and to reach a verdict based upon the evidence it found to be credible. We find that the overwhelming weight of the evidence supports the jury's verdict of guilty. We also find that reasonable and fair-minded jurors could have found Young guilty based on the weight and quality of evidence before us on appeal. Therefore, this issue is without merit.
 II. Whether the trial court erred by allowing the identification testimony regarding the alleged show-up.
 ¶ 15. The admission or exclusion of evidence is within the discretion of *Page 118 
the trial court. Thompson v. State, 726 So.2d 233,235 (¶ 9) (Miss.Ct.App. 1998) (citing Hentz v. State,542 So.2d 914, 917 (Miss. 1989)). When determining whether to suppress pretrial identification evidence, the trial court must decide whether the law enforcement agency employed an identification procedure that would be highly suggestive.Thompson, 726 So.2d at 235 (¶ 9) (citingYork v. State, 413 So.2d 1372, 1383 (Miss. 1982)). The standard of review for suppression hearings on matters of pretrial identification is "whether substantial credible evidence supports the trial court's finding that, considering the totality of the circumstances the in-court identification testimony was not impressibly tainted." Guerrero v.State, 943 So.2d 774, 777-78 (¶ 9) (Miss.Ct.App. 2006) (citing Johnson v. State, 884 So.2d 787, 789 (¶ 4) (Miss.Ct.App. 2004)); Gray v. State, 728 So.2d 36, 68
(¶ 159) (Miss. 1998). On review, the appellant court should reverse the lower court's grant or denial of a motion to suppress pretrial identification testimony only where there is no credible evidence to support the decision. Guerrero,943 So.2d at 778 (¶ 9) (citing Johnson,884 So.2d at 789 (¶ 4)); Ray v. State, 503 So.2d 222, 224
(Miss. 1986).
 ¶ 16. When determining whether the pretrial identification was impermissibly tainted so as to deprive the defendant of due process, the court should apply the five enumerated factors inNeil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375,34 L.Ed.2d 401 (1972), as applied by this Court in Garner v.State, 856 So.2d 729, 733 (¶ 12) (Miss.Ct.App. 2003). The five factors are:
 (1) the opportunity of the witness to view the accused at the time of the crime;
 (2) the degree of attention exhibited by the witness;
 (3) the accuracy of the witness's prior description of the criminal;
 (4) the level of certainty exhibited by the witness at the confrontation; and
 (5) the length of the time between the crime and the confrontation.
Id. Ultimately, the court must discern whether the pretrial identification is reliable. Thompson,726 So.2d at 235 (¶ 10) (citing York, 413 So.2d at 1383
(Miss. 1982)).
 ¶ 17. Young's essential argument appears to be that the trial court erred in denying the pretrial suppression motion regarding Grant and Parker's identification of him to Officer Kirklin when Young was brought into the Indianola Police Station in handcuffs. Additionally, he contends that the show-up[3]
violated his Sixth Amendment right to counsel. The facts in the present case are similar to those in Guerrero, where Guerrero sought to suppress a pretrial identification of him when he was in the holding cell at the jail and a witness immediately identified him as the shooter as she entered the jail and saw him through a window. Guerrero,943 So.2d at 778 (¶ 10). The witness testified that she immediately recognized Guerrero through the glass because he was wearing the same clothes and had distinctive acne. Id. A deputy testified that the witness had not been told Guerrero was a suspect. Id. This Court found the circumstance to be mere happenstance and that there was nothing in the record to indicate the sheriff's department had purposefully arranged for the encounter between Guerrero and the witness. Id. We find that the circumstances that Grant and Parker identified *Page 119 
Young at the Indianola Police Station to be very similar to those of Guerrero's and that the officers did not do anything purposeful to arrange the encounter which led to Grant and Parker's identification of Young as the man who had stolen their vehicle. However, in arguendo, if Young did have a legitimate due process claim we are of the same opinion as inGuerrero, that under the Biggers factors, Grant and Parker's identification of Young was not made under such unnecessarily suggestive circumstances as to destroy the probative value of their identification. Guerrero,943 So.2d at 779 (¶ 12).
 ¶ 18. As to Young's claim that his Sixth Amendment right to counsel was violated regarding the "show-up" incident and then later the photographic identification by Grant and Parker, we disagree. The right to counsel under the United States Constitution attaches at the commencement of "formal criminal proceedings of an adversarial nature." Thompson,726 So.2d at 236 (¶ 17) (citing Kirby v. Illinois,406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). Under the United States Supreme Court's interpretation, formal adversarial proceedings may be initiated by "way of a formal charge, preliminary hearing, indictment, information, or arraignment."Kirby, 406 U.S. at 689, 92 S.Ct. 1877. However, the Mississippi Supreme Court has held that the "adversarial process begins when the law enforcement arm of the state takes the defendant into custody, and charges him with a crime." Nixonv. State, 533 So.2d 1078, 1087 (Miss. 1987). As inNixon, we find that Young was merely a suspect at the time of the pretrial identifications and no formal charges had yet been made against him. Therefore, this issue is without merit.
 ¶ 19. THE JUDGMENT OF THE SUNFLOWER COUNTY CIRCUITCOURT OF CONVICTION OF CAR JACKING AND SENTENCE OF FIFTEEN YEARSIN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHFIVE YEARS SUSPENDED AND FIVE YEARS' POST-RELEASE SUPERVISION,PAY A FINE OF $1,000 AND PAY $250 TO THE VICTIM'S COMPENSATIONFUND IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TOSUNFLOWER COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR.
[1] According to his testimony, the reports came in close to 5 p.m. on Friday and that the following Monday was Veterans Day which was why he did not begin investigating the complaint until the following Tuesday, November 13.
[2] Young's counsel argued this same point at the close of the State's case-in-chief in his motion for directed verdict, during the discussion of which jury instructions would be given, and again in his motion for JNOV or, in the alternative, a new trial. At no time was the trial judge in agreement with Young's counsel and each time the assertion was over-ruled.
[3] A show-up is "a pretrial identification procedure in which a suspect is confronted with a witness to or the victim of a crime," essentially, one-on-one confrontation. Blacks Law Dictionary 1385 (7th Edition 1999).